AB:RJN
F. #2009R01167

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -                  Cr. No. <u>10-0010 (S-1)(ENV)</u>

NICHOLAS BERNARDO,
JEROME CARAMELLI,
    also known as "Jerry,"
JOHN PAUL CRUZ,
DOMENICO CUTAIA,
    also known as "Danny,"
JOSEPH CUTAIA,
    also known as "Joey,"
    "Joseph DeGerolamo" and
    "The Kid,"
SALVATORE CUTAIA,
    also known as "Sal,"
ERIC MAIONE,
ANTHONY MANNONE,
    also known as "Anthony
    from Elmont" and "Anthony
    from the Five Towns," and
CARLO PROFETA,

            Defendants.

- - - - - - - - - - - - - - - - -X

MEMORANDUM OF LAW IN SUPPORT OF THE
<u>GOVERNMENT'S MOTION FOR PERMANENT ORDERS OF DETENTION</u>

                           BENTON J. CAMPBELL
                           United States Attorney
                           Eastern District of New York
                           271 Cadman Plaza East
                           Brooklyn, New York 11201

Rachel J. Nash
Assistant United States Attorney

## Table of Contents

PRELIMINARY STATEMENT.. . . . . . . . . . . . . . . . . . . . . 1

I.    Superseding Indictment and Investigation.. . . . . . . . . 3

II.   Legal Standard.. . . . . . . . . . . . . . . . . . . 6

III.  The Defendants Pose a Danger to the Community. . . . . . 15

      A.    Summary of Extortion Charges. . . . . . . . . . . 15

      B.    Defendants. . . . . . . . . . . . . . . . . . . .17

            1.    Anthony Mannone

            2.    Jerome Caramelli

            3.    Carlo Profeta

IV.   Conclusion.. . . . . . . . . . . . . . . . . . . . . 26

i

**PRELIMINARY STATEMENT**

The government hereby moves for a permanent order of
detention with respect to defendants Anthony Mannone, Carlo
Profeta and Jerome Caramelli, each of whom was arrested today.
As further described below, each of these defendants poses a
danger to the community and thus should be detained pending
trial.

Anthony Mannone is a captain of the Bonanno organized
crime family of La Cosa Nostra ("LCN"), a violent criminal
enterprise.  Mannone committed the charged crimes while on
federal supervised release.  As described herein, Mannone used
his position as a captain to direct others to make threats and
engage in violence on his behalf.  Mannone was, for example,
consensually recorded instructing a soldier to collect a debt as
follows: "go get your gun and go get your knife and put your mask
on, and go rob . . . ."

Jerome Caramelli is an associate of the Bonanno family
and, on Mannone's orders, threatened victims.  Caramelli was
consensually recorded discussing his penchant for violence,
including his desire, as to a particular debtor, to "knock[] him
out" and "hit him with a fucking bat."

Carlo Profeta is an acting captain of the Luchese
family.  Profeta committed the charged crimes while on federal
supervised release.  Profeta was previously convicted for
engaging in Hobbs Act extortion, including threatening physical

harm to business owners for failing to pay "protection" money. More recently, as charged in the superseding indictment, Profeta conspired with Mannone and Caramelli, Profeta's violent organized crime counterparts, to engage in extortionate collection of credit from a debtor.

I.   **Superseding Indictment and Investigation**

     A.   The Investigation

        The superseding indictment returned in this matter is the result of an investigation by the Federal Bureau of Investigation ("FBI") of members and associates of the Bonanno and Luchese organized crime families of La Cosa Nostra operating in the Eastern District of New York.  The investigation included, among other things, surveillance and consensual recordings made by cooperating witnesses of meetings and telephone calls with Mannone, Profeta, Caramelli and others.

        The FBI investigation is the latest in a series of investigations of La Cosa Nostra prosecuted by this Office.  In those investigations, members and associates of La Cosa Nostra have agreed to cooperate with the government, including high-ranking members of the Bonanno, Colombo, Gambino and Luchese organized crime families.  These cooperating witnesses have advised, among other things, that the Bonanno and Luchese families exist and that they are a part of a violent criminal enterprise that engages in egregious criminal acts, including murder and assault, and crimes intended to obstruct justice.  Brief overviews of the charges set forth in the superseding indictment are detailed below.

_____

3

B.   <u>Superseding Indictment</u>

On February 4, 2010, a grand jury sitting in the Eastern District of New York returned an eighteen count superseding indictment charging various crimes against nine defendants.  The three defendants the government seeks to detain are each charged with racketeering and racketeering conspiracy, based on predicate acts that include, among other crimes, extortionate extension of credit, in violation of 18 U.S.C. § 892(a), and extortionate collection of credit, in violation of 18 U.S.C. § 894(a)(1), both of which are crimes of violence.

The indictment also charges Domenico Cutaia, Joseph Cutaia, Salvatore Cutaia, Nicholas Bernardo and John Paul Cruz with crimes of violence, including extortionate collection of credit, Hobbs Act robbery and unlawful use of a firearm.  These individuals also pose a danger to the community, but the government has not sought their detention in this motion because each of these defendants is already detained pending trial or incarcerated pursuant to a prior sentence.[1]

---

[1]   Nicholas Bernardo, Joseph Cutaia and John Paul Cruz were previously arrested and indicted for the Hobbs Act and firearm charges and permanent orders of detention were entered on December 9, 2009, December 23, 2009 and December 29, 2009, respectively.  Domenico Cutaia and Salvatore Cutaia are currently incarcerated for their conviction in <u>United States v. Domenico Cutaia</u>, et al, 08-0098 (BMC).

4

Listed in the chart below is a summary of all the Racketeering Acts and criminal counts included in this superseding indictment:

| Count | Description | Defendants |
|-------|-------------|------------|
| 1 | RICO (2000-2009) | Jerome Caramelli<br>Joseph Cutaia<br>Salvatore Cutaia<br>Eric Maione<br>Anthony Mannone<br>Carlo Profeta |
| RA 1<br>(Counts 3-4) | Extortion Conspiracy/Extortionate Collection of Credit (John Doe # 1) (2001-2009) | Joseph Cutaia<br>Salvatore Cutaia<br>Domenico Cutaia<br>(substantive counts only) |
| RA 2<br>(Count 5) | Illegal Gambling - Sports Betting (2008-2009) | Eric Maione<br>Carlo Profeta |
| RA 3<br>(Counts 6-9) | Extortion Conspiracy/Extortionate Extension and Collection of Credit (John Doe # 1) (October 2008 - February 2009) | Eric Maione<br>Carlo Profeta |
| RA 4<br>(Count 10) | Illegal Gambling - Sports Betting (October 2008 - February 2009) | Jerome Caramelli<br>Anthony Mannone |
| RA 5<br>(Count 11 - 12) | Extortionate Collection of Credit Conspiracy - Gambling Debt (John Doe # 1) (October 2008 - February 2009) | Jerome Caramelli<br>Salvatore Cutaia<br>Anthony Mannone<br>Carlo Profeta |
| RA 6<br>(Count 13) | Extortionate Collection of Credit Conspiracy - Gambling Debt (John Doe # 3) (October 2008 - February 2009) | Jerome Caramelli<br>Salvatore Cutaia<br>Anthony Mannone<br>Carlo Profeta |
| RA 7<br>(Counts 14-15) | Extortionate Collection of Credit Conspiracy - Gambling Debt (John Doe # 4) (October 2008 - February 2009) | Jerome Caramelli<br>Salvatore Cutaia<br>Anthony Mannone<br>Carlo Profeta |
| RA 8 | Larceny by Extortion and Conspiracy to Commit Larceny by Extortion - (John Doe # 2) (October 2008 - February 2009) | Joseph Cutaia<br>Salvatore Cutaia |

| Count | Description | Defendants |
|-------|-------------|------------|
| Count 2 | RICO Conspiracy | Jerome Caramelli<br>Joseph Cutaia<br>Salvatore Cutaia<br>Eric Maione<br>Anthony Mannone<br>Carlo Profeta |
| Count 16 | CUD RICO Conspiracy - Usury (John Doe # 2) (2007 - November 2009) | Anthony Mannone |
| Count 17 | Hobbs Act Conspiracy (November 9 - November 11, 2009) | Nicholas Bernardo<br>John Paul Cruz<br>Joseph Cutaia |
| Count 18 | Unlawful Use of a Firearm (November 11, 2009) | Nicholas Bernardo<br>John Paul Cruz<br>Joseph Cutaia |

## II.   Legal Standard

### A.   The Bail Reform Act

Under the Bail Reform Act, Title 18, United States Code, Sections 3141 et seq., federal courts are empowered to order a defendant's detention pending trial upon a determination that the defendant is either a danger to the community or a risk of flight.  See 18 U.S.C. § 3142(e) ("no condition or combination of conditions would reasonably assure the appearance of the person as required and the safety of any other person and the community").  A finding of dangerousness must be supported by clear and convincing evidence.  A finding of risk of flight must be supported by a preponderance of the evidence.  See United States v. Chimurenga, 760 F.2d 400, 405 (2d Cir. 1985).

The Bail Reform Act lists four factors to be considered in the detention analysis: (1) the nature and circumstances of

6

the crimes charged; (2) the history and characteristics of the defendant; (3) the seriousness of the danger posed by the defendant's release; and (4) the evidence of the defendant's guilt.  <u>See</u> 18 U.S.C. § 3142(g).

      B.   <u>Organized Crime Defendants</u>

           District courts in this Circuit routinely have faced the issue of pretrial detention of organized crime defendants charged with racketeering-related offenses.  <u>See</u>, <u>e.g.</u>, <u>United States v. Cirillo</u>, Cr. No. 05-212 (SLT), slip op. (E.D.N.Y. 2005) (Genovese family acting bosses Dominick Cirillo and Lawrence Dentico, as well as Genovese family captain Anthony Antico, detained as dangers to the community), <u>aff'd</u>, 149 Fed. Appx. 40 (2d Cir. 2005); <u>United States v. Gotti</u>, 219 F. Supp. 2d 296, 299-300 (E.D.N.Y. 2002) (Gambino family acting boss Peter Gotti detained as danger to the community), <u>aff'd</u>, <u>United States v. Ciccone</u>, 312 F.3d 535, 543 (2d Cir. 2002); <u>United States v. DeFede</u>, 7 F. Supp. 2d 390, 395 (S.D.N.Y. 1998) (Luchese family acting boss Joseph DeFede detained as danger to the community); <u>United States v. Agnello</u>, 101 F. Supp. 2d 108, 116 (E.D.N.Y. 2000) (Gambino family captain Carmine Agnello detained as danger to the community); <u>United States v. Salerno</u>, 631 F. Supp. 1364, 1375 (S.D.N.Y. 1986) (Genovese acting boss and captain detained as danger to the community).

Together, these cases stand for the following propositions: (1) leaders of a violent organized criminal enterprise inherently are dangerous due to their position of authority in that enterprise; (2) organized crime defendants often constitute dangers to the community due to the high likelihood that they will continue to commit crimes if released on bail; and (3) elaborate bail packages involving home detention and electronic monitoring are insufficient safeguards to protect the community against dangerous organized crime defendants.

    1.   Organized Crime Leaders Are Dangers to the Community

Pretrial detention is warranted where defendants, charged with violent crimes, are high-ranking members of a criminal organization whose activities routinely include violence and threats of violence.  See Ciccone, 312 F.3d at 543; United States v. Colombo, 777 F.2d 96, 99-100 (2d Cir. 1985); United States v. Bellomo, 944 F. Supp. 1160, 1166 (S.D.N.Y. 1996).  For example, in United States v. Salerno, 631 F. Supp. 1364, 1375 (S.D.N.Y. 1986), order vacated, 794 F.2d 64 (2d Cir.), order reinstated, 829 F.2d 345 (2d Cir. 1987), in ordering the detention of two leaders of the Genovese family, the district court observed that:

> The activities of a criminal organization such as the Genovese Family do not cease with the arrest of its principals and their release on even the most stringent of bail conditions.  The illegal businesses, in place

8

> for many years, require constant attention
> and protection, or they will fail. Under
> these circumstances, this court recognizes a
> strong incentive on the part of its
> leadership to continue business as usual.
> When business as usual involves threats,
> beatings, and murder, the present danger such
> people pose in the community is self evident.

Salerno, 631 F. Supp. at 1375.

Similarly, in Defede, 7 F. Supp. 2d at 391, the
defendant, Joseph Defede, was charged with extortion and
extortion conspiracy. The district court ordered Defede's
pretrial detention, finding that the government had shown by
clear and convincing evidence that Defede was the acting boss of
the Luchese family, thus rendering him a danger to public safety:

> The acting boss of the Luchese family
> supervises all of its far-flung criminal
> activities, including acts of violence.
> Defede's continued liberty therefore presents
> a substantial danger to the public.

Id. at 395. Indeed, the Second Circuit has upheld the detention
of organized crime defendants because "their continued liberty
presents a risk to the public not only from their own violent
activities but from those of subordinates whom they supervise."
United States v. Cirillo, 149 Fed. Appx. 40 (2d Cir. 2005)
(summarily affirming the decision of Magistrate Judge Robert M.
Levy to detain the acting boss and former acting boss of the
Genovese family.)

In addition, to be detained as a danger to the
community, an organized crime defendant need not be charged in

9

specific predicate acts of violence; position in a violent organization itself is proof of danger. Ciccone, 312 F.3d at 542-43; see also United States v. Ferranti, 66 F.3d 540, 543 (2d Cir. 1995) (noting that the defendant need not have committed the violence himself, he can be deemed dangerous if he directed others to commit acts of violence) (citing Colombo, 777 F.2d at 98). As one court has observed, an organized crime leader "is dangerous because inherent in the leadership position is the supervision of criminal activity that cannot be curtailed by any condition or combination of conditions of release." Gotti, 219 F. Supp. 2d at 299-300 (citations omitted).

To be sure, courts' decisions to deny bail to organized crime leaders have not been based solely on the defendants' mere "association" with organized crime, but rather on the evidence that members of organized crime, and in particular, high-ranking members of organized crime, routinely engage in acts of violence as a result of their position in a criminal enterprise. As the court held in Defede, 7 F. Supp. 2d at 392:

> it is well established that persons who hold Defede's status routinely engage in conduct that is a menace to public safety. The argument thus is based not on the status, but on the inference that a person in Defede's position is quite likely to engage in dangerous conduct – just as one reasonably could infer that one holding the position of major league baseball pitcher is entirely likely to hurl a small white object in the direction of home plate.

10

Moreover, in enacting the Bail Reform Act, Congress itself recognized that high-ranking members of an organized crime family fall within the "small but identifiable group of particularly dangerous defendants as to whom neither the imposition of stringent release conditions nor the prospect of revocation of release can reasonably assure the safety of the community." S. Rep. No. 225 98th Cong., 1st Sess. at 6-7, as reprinted in 1984 U.S. Code Cong. & Admin. News 3182 ("Senate Report"), 3188-89.

Nor is the above caselaw narrowly limited to organized crime "bosses" or "acting bosses." In United States v. Salerno, 631 F. Supp. at 1374-75, the court held that a defendant would be a danger to the community if released on bail based on evidence that he was a captain in an organized crime family who managed the enforcement operations of the enterprise. In Colombo, 777 F.2d at 99, a captain of a crew in the Colombo family was ordered detained because the operation of that organization posed a "risk to the public" and a "danger to the community" by its "consistent pattern of orchestrating a series of violent criminal operations."

> 2. Organized Crime Defendants Are Likely to Commit Crimes if Released on Bail

Organized crime defendants pose a particular threat to the community due to the continuing nature of the charged enterprise and its violent criminal activities. At bottom,

11

because organized crime defendants are career criminals who
belong to an illegal enterprise, they pose a distinct threat to
commit additional crimes if released on bail.  See Salerno, 631
F. Supp. at 1375 (finding that the illegal businesses of
organized crime require constant attention and protection, and
recognizing a strong incentive on the part of its leadership to
continue business as usual).

Congress noted that defendants pose a danger to the
community not only when they commit acts of violence, but when it
is likely that they will commit even non-violent crimes that are
detrimental to the community.  See Senate Report at 3195
("language referring to safety of the community refers to the
danger that the defendant might engage in criminal activity to
the detriment of the community . . . . The Committee intends that
the concern about safety be given a broader construction than
merely danger of harm involving physical violence").  In Salerno,
631 F. Supp. at 1371, the court held:

> In light of Congress' direction that '[w]here
> there is a strong probability that a person
> will commit additional crimes if released,
> the need to protect the community becomes
> sufficiently compelling that detention is, on
> balance, appropriate' . . . .

See also United States v. Colombo, 777 F.2d 96, 99 (2d Cir.
1985).  Ultimately, the court in Salerno detained two leaders of

the Genovese organized crime family, noting:

> The activities of a criminal organization
> such as the Genovese Family do not cease with
> the arrest of its principals and their
> release on even the most stringent of bail
> conditions.  The illegal businesses, in place
> for many years, require constant attention
> and protection, or they will fail.  Under
> these circumstances, this court recognizes a
> strong incentive on the part of its
> leadership to continue business as usual.
> When business as usual involves threats,
> beatings, and murder, the present danger such
> people pose in the community is self evident.

631 F. Supp. at 1375.

> 3.   Elaborate Bail Packages Are Insufficient
>      to Protect the Community Against Violent
>      Organized Crime Defendants

Finally, the Second Circuit repeatedly has rejected
"elaborate" bail packages for dangerous defendants, including
leaders of organized crime families shown to be involved in
violent criminal activities.  See United States v. Dono, Nos. 07-
5333-cr(L), 07-5334-cr(CON), 2008 WL 1813237, at *2-3 (2d Cir.
April 23, 2008) (rejecting conditions that included, among
others, home detention and electronic monitoring, and a
requirement that the defendant's father – a retired police
officer – take "personal responsibility" for the defendant);
Ferranti, 66 F.3d at 543-44 (rejecting $1 million bail secured by
real property); United States v. Orena, 986 F.2d 628, 630-33 (2d
Cir. 1993) (rejecting $3 million bail secured with real property,
in-home detention, restricted visitation and telephone calls and

13

electronic monitoring); <u>Colombo</u>, 777 F.2d at 97, 100 (rejecting $500,000 bail secured with real property).

The Second Circuit has viewed home detention and electronic monitoring as insufficient to protect the community against dangerous individuals.  In <u>United States v. Millan</u>, 4 F.3d 1039, 1048-49 (2d Cir. 1993) (citations and internal quotations omitted), the Second Circuit held that:

> Home detention and electronic monitoring at best elaborately replicate a detention facility without the confidence of security such a facility instills. If the government does not provide staff to monitor compliance extensively, protection of the community would be left largely to the word of [the defendants] that [they] will obey the conditions.

<u>See also</u> <u>Orena</u>, 986 F.2d at 632 ("electronic surveillance systems can be circumvented by the wonders of science and of sophisticated electronic technology") (internal quotation marks and citations omitted).

Similarly, courts in this district have denied dangerous defendants bail in recognition of the Second Circuit's dim view of the effectiveness of home detention and electronic monitoring.  <u>See</u>, <u>e.g.</u>, <u>Dono</u>, 2008 WL 1813237, at *2-3 (noting that the idea that "'specified conditions of bail protect the public more than detention is flawed'") (quoting <u>Orena</u>, 986 F.2d at 632); <u>United States v. Cantarella</u>, 2002 WL 31946862, *3-4 (E.D.N.Y. 2002) (adopting "principle" of "den[ying] bail to

14

'dangerous' defendants despite the availability of home detention and electronic surveillance and notwithstanding the value of a defendant's proposed bail package"); Agnello, 101 F. Supp. 2d at 116 ("the protection of the community provided by the proposed home detention remains inferior to that provided by confinement in a detention facility"); United States v. Masotto, 811 F. Supp. 878, 884 (E.D.N.Y. 1993) (rejecting bail because "the Second Circuit appears to be saying to us that in the case of 'dangerous defendants' the Bail Reform Act does not contemplate the type of conditions suggested by this Court [including home confinement and electronic monitoring] and that, even if it did, the conditions would not protect the public or the community, given the ease with which many of them may be circumvented").

## III. **The Defendants Pose a Danger to the Community**

The government proffers the following facts concerning the charges, the defendants and the need for the pretrial detention of Mannone, Caramelli and Profeta. See United States v. LaFontaine, 210 F.3d 125, 130-31 (2d Cir. 2000) (the government is entitled to proceed by proffer in a detention hearing); United States v. Ferranti, 66 F.3d 540, 542 (2d Cir. 1995) (same); United States v. Martir, 782 F.2d 1141, 1145 (2d Cir. 1986) (same).

A.    Summary of Extortion Charges

        The defendants are charged with extortionate extension
and collection of credit.  These charges constitute crimes of
violence pursuant to the Bail Reform Act because both involve the
threat of violence to the debtor.  See 18 U.S.C. § 891(7)
(defining "extortionate means" to be "any means which involves
the use, or an express or implicit threat of use, of violence or
other criminal means to cause harm to the person, reputation, or
property of any person"); id. § 3156(a)(4)(A) (defining "crime of
violence" as having as element of offense "the use, attempted
use, or threatened use of physical force against the person or
property of another"); United States v. Gotti, 219 F. Supp 2d at
298 (citing United States v. Agnello, 101 F. Supp. 2d at 110);
United States v. Defede, 7 F. Supp. 2d at 396 (all defining
extortion as a crime of violence).

        Of particular relevance to the government's request for
detention is the defendants' participation in a conspiracy to use
extortionate means to collect money from CW#1 (John Doe #1), John
Doe #3 and John Doe #4.[2]  Jerome Caramelli claimed that CW#1,
John Doe #3 and John Doe #4 owed approximately $193,000 as a

_____

        [2]    These charges are contained in Racketeering Acts Five
through Seven and Counts Eleven through Fifteen.  The numbers
used to identify the victims of the extortionate collection of
credit conspiracy correspond to the numbers use in the
indictment.

result of their involvement in a gambling operation that Caramelli ran.  Because of Mannone's position as Caramelli's captain, Caramelli sought Mannone's assistance in collecting this debt.  CW#1, a soldier in a different crime family, sought assistance from Salvatore Cutaia and Profeta.  Two meetings were held to address the dispute, during which Salvatore Cutaia and Profeta agreed with Mannone and insisted that CW#1 use whatever means necessary to collect and repay the money.  These meetings were recorded by CW#1, and the import of the discussion is clear. Mannone, with support from Salvatore Cutaia and Carlo Profeta, threatened physical harm to CW#1 if he failed to repay Caramelli, and encouraged CW#1 to threaten John Doe #3 and John Doe #4 with physical harm as well.

As set forth in more detail below, in the course of this conspiracy, Mannone and Profeta demonstrated their ability, as LCN leaders, to direct others to engage in acts of violence. Caramelli, though not a made member of LCN, also poses a serious threat to the community.  As a participant in this conspiracy, Caramelli demonstrated his willingness to follow the violent directives of Mannone, and, moreover, expressed an independent desire to engage in violent acts.

B.    The Defendants

1.    Anthony Mannone

Mannone committed the crimes alleged in the superseding indictment while on supervised release following his conviction and incarceration for loansharking.  He is charged with: racketeering and the collection of unlawful debt, in violation of 18 U.S.C. § 1962(c); racketeering conspiracy, in violation of 18 U.S.C. § 1962(d), including predicates acts of conspiracy to engage in extortionate collection of credit from CW#1, John Doe #3 and John Doe #4; extortionate collection of credit conspiracy and attempted extortionate collection of credit, in violation of 18 U.S.C. § 894(a)(1); and illegal gambling, in violation of 18 U.S.C. § 1955(a).

a.    Mannone is a Bonanno Captain

Anthony Mannone is an inducted member of the Bonanno family, who currently holds the position of captain.  Mannone's position has been confirmed by cooperating witnesses and by consensual recordings.  For example, CW#2 is expected to testify that he made tribute payments to Mannone because of Mannone's position as a captain.  Furthermore, the consensual recordings made by CW#1 demonstrate Mannone's leadership role within the family.  He presided over two meetings, or "sit-downs," during which Mannone and others discussed the debt allegedly owed by CW#1, John Doe #3 and John Doe #4.  Mannone determined the time

18

and place of the meetings, controlled the topics discussed and determined the individuals who participated in the discussion.

### b.  Evidence of Danger to the Community

Consensual recordings made by CW#1 reflect that Mannone is willing to use violence, including ordering others to engage in violence. For example, during the sit-down on January 23, 2010 held to discuss the debt that CW#1, John Doe# 3 and John Doe #4 owed to Caramelli, Mannone instructed CW#1:

> Then you know what, then you better put
> a leash on him and get our fuckin'
> money, I'm telling you in front of your
> friend, who is my friend, and his father
> is my friend from fuckin' 40 years ago.[3]

After this meeting, when the payment was not forthcoming, Mannone dispatched Caramelli to threaten CW#1 with harm if he failed to repay. CW#2 is expected to testify that Mannone instructed Caramelli on how to threaten CW#1, and recordings between CW#1 and Caramelli demonstrate that Caramelli followed these instructions. See infra, at 22-23. After receiving these threats, CW#1, fearful for his own safety as well as the safety of his family, approached Profeta, in the hope that Profeta would protect CW#1's interests. A second "sit-down" was held. During that meeting, Mannone again threatened CW#1 and

---

[3]    The word "friend" is commonly used by members of LCN to refer to other LCN members. As described above, Salvatore Cutaia attended this meeting with CW#1. Mannone is referring to Salvatore Cutaia and his father, Domenico Cutaia, a captain of the Luchese family.

instructed him to use violence if necessary to obtain the money owed.

> You know you owe the money, go get the money from them guys and bring us the money.  Go get your gun and go get your knife and put your mask on, and go rob like you told my guy to go rob and you got paid . . . .  They're your guys you said you were gonna service it, and that's all I'm looking for, nothing more, nothing less.  But not five months later, let me tell ya, if you didn't come from where you came from, you're dead . . . .  That ain't a threat . . . . And it's a one shot deal, take one day, two days if you need it . . . . You gotta meet Tuesday or Wednesday or Thursday, I want this thing put to bed. And listen to me, I told you in front of the other guy you came with, the last time with him, don't start bringing a thousand dollars a week.  I'm not waiting for a thousand dollars a week at 193.

       c.   <u>Criminal History</u>

As noted above, Mannone committed the crimes described above while on supervised release.  Thus, he has proven that he cannot be trusted to abide by court-ordered conditions that might otherwise be set as conditions of bail.  In 2003, Mannone was convicted in the Eastern District of New York of conspiracy to make extortionate extensions of credit and was sentenced to 30 months' incarceration and three years of supervised release. Mannone, together with others, explicitly threatened others with physical harm for failing to repay the money they borrowed from Mannone through his associates.  Mannone was released in February

20

2006 and began serving his term of supervised release.  He was still serving this term of supervised release in January 2009 when he engaged in the crimes alleged in the superseding indictment.

      2.  <u>Jerome Caramelli</u>

      Caramelli is charged with: racketeering, in violation of U.S.C. § 1962(c); racketeering conspiracy, in violation of 18 U.S.C. § 1962(d), including predicates acts of conspiracy to engage in extortionate collection of credit from CW#1, John Doe #3 and John Doe #4; extortionate collection of credit conspiracy and attempted extortionate collection of credit, in violation of 18 U.S.C. § 894(a); and illegal gambling, in violation of 18 U.S.C. § 1955(a).

      a.  <u>Position</u>

      Caramelli is an associate of the Bonanno Family in Mannone's crew.  As described above, during the meetings held on January 23 and February 16, 2009, Mannone spoke on Caramelli's behalf, insisting that CW#1 collect and pay the $193,000 that Caramelli claimed he was owed.  CW#2 is expected to testify that Mannone used Caramelli to carry out his directives, and the consensual recordings made by CW#1 and CW#2 corroborate the information provided by CW#2 with respect to Caramelli's relationship to Mannone.  For example, Caramelli discussed with CW#2 that he needed permission from Mannone before he could

physically harm CW#1 for failing to pay the debt.

Caramelli told CW#2 about his desire to "knock[] him out" and

"hit him with a fucking bat."

> b. <u>Evidence of Danger to the Community</u>

Consensual recordings, such as the excerpt provided

above, demonstrate that Caramelli is a dangerous individual who

is willing, indeed eager, to engage in intimidation and violence.

For instance, Caramelli described for CW#2 an incident involving

another individual who Caramelli mistakenly believed was

cooperating with the government.

> I backed him against the wall and he wanted
> to get out of there.  He said get the fuck,
> let go of me.  And I fucked with him
> . . . . and I checked him for a wire.

Moreover, recordings made by CW#1 reflect that

Caramelli is not only willing to engage in intimidation and

violence independently, but will also follow directions from

individuals like Mannone to engage in intimidation and violence

to further the criminal enterprise.  For example, on February 6,

2009, on orders from Mannone, Caramelli told CW#1:

> I want my fuckin' money [CW#1], okay?  I
> wanted my fuckin' money.  I - I know you
> got it . . . . Uh listen, I'm gonna send
> a message, I don't really care . . . .
> Why would you take your friend [Mannone]
> and make him your enemy . . . . he told
> me to tell you, you got 24 hours to get
> in touch with him.  Tomorrow morning
> he's gonna go and check in again, and if
> he, he ain't got no arrangement made up
> with you yet then he's got his answer.

> Now, I know he ain't fuckin' around with
> the 24 hour thing.  24 hours is tomorrow
> morning.

Both CW#1 and CW#2 both understood that the only reason Caramelli

did not physically harm CW#1 after making this threat is that

CW#1 scheduled a second meeting to which Profeta, an acting

captain in the Luchese family, was invited.  After that second

meeting on February 22, 2009, Caramelli called CW#1 to threaten

his safety if he failed to pay a substantial sum of money to

Mannone:

> Tomorrow, all shit is going to break loose.
> I thought you were going to call with
> something significant and that was going to
> be the missing element . . . . but that's not
> the case so, there's nothing really I can do,
> I known that, and I pretty much know where
> it's gonna go . . . . the next or so I'm sure
> you'll hear something . . . . Ant [referring
> to Mannone], he's beyond fuckin twisted right
> now . . . . I don't know what to tell you
> . . . . we waited for you to contact Georgie
> and nothing came in by twelve and that was
> the straw that broke the camel's back . . . .
> he just said if you happen to hear from him,
> unless he has something significant, hang up
> the fuckin the phone.  The only thing I
> could've gone to him with was if you had
> something significant . . . . he's tried to
> do it the nice way . . . . he's got to the
> point now where it's time. . . . he told me
> to return your call . . . . and if you had
> something significant he said then come to
> him and then we'll be civilized . . . . I
> hate to say it, you're not someone I'm trying
> to fuckin put a scare into because I don't
> need to do that, you know, this is not good
> . . . . he [Mannone] already made the
> decision this is not gonna end good.

23

In light of the escalating threats contained in the foregoing conversations, FBI agents ended CW#1's proactive cooperation and relocated him.  The foregoing conversations conclusively demonstrate that the defendants would not hesitate to threaten and harm individuals who do not have protection from law enforcement authorities.

      3.   <u>Carlo Profeta</u>

Profeta is also charged with racketeering: in violation of 18 U.S.C. § 1962(c); racketeering conspiracy, in violation of 18 U.S.C. § 1962(d), including predicate acts of conspiracy to engage in extortionate collection of credit from CW#1, John Doe #3 and John Doe #4; extortionate extension of credit conspiracy and extortionate extension of credit, in violation of 18 U.S.C. § 982(a); extortionate collection of credit conspiracy, extortionate collection, and attempted extortionate collection of credit, in violation of 18 U.S.C. § 894(a); and illegal gambling, in violation of 18 U.S.C. § 1955(a).  He committed these crimes while serving a term of federal supervised release which expires in March 2010.

      a.   <u>Position</u>

Carlo Profeta is an acting captain of the Luchese family.  According to CW#1, Profeta informed CW#1 that he was acting captain for Domenico Cutaia because Cutaia was under indictment in the Eastern District of New York.  Profeta informed

24

CW#1 that he would be "earning for" Profeta, meaning that CW#1 was required to provide Profeta with a portion of any criminal proceeds he earns.  Profeta also informed CW#1 that he demanded $100 per month from every member of his crew.  Consensual recordings between CW#1 and Eric Maione corroborate CW#1's information regarding Profeta's position in the Luchese family.

In addition, conversations between CW#1 and Eric Maione regarding the $20,000 loan that Profeta extended to CW#1 also reflect Profeta's position of authority.  For example, on one occasion, Maione stated, "he [meaning Profeta] wants you to bring it [meaning the principal of the loan] back little by little."

b.   Evidence of Danger to the Community

Like Mannone, Profeta engaged in criminal activity while on supervised release, having been convicted of extorting several business owners.  Despite the conditions of his supervised release, Profeta continued to engage in criminal activity for the Luchese family to further the LCN criminal enterprise.

Profeta conspired with Mannone and Caramelli to collect money that Caramelli claimed CW#1, John Doe #3 and John Doe #4 owed.  Although CW#1 enlisted Profeta's assistance, Profeta ultimately sided with Mannone and Caramelli, insisting that CW#1 satisfy Mannone's demands and use whatever means necessary to collect the money owed, thereby demonstrating his willingness to

25

use violence to benefit other LCN members.  Moreover, CW#1 is expected to testify that he understood and feared, based on Profeta's position in the Luchese family, that failure to make the weekly interest payments on the debt he owed Profeta could result in physical harm to CW#1 or members of his family.

c.   Criminal History

Carlo Profeta's criminal history further demonstrates that he will continue to pose a danger to the community if he is released on bail.  Profeta was convicted in 2003 in the Southern District of New York of racketeering conspiracy, in violation of 18 U.S.C. § 1962(d), and two counts of Hobbs Act extortion in violation of 18 U.S.C. § 1951(a), both crimes of violence.[4]  The criminal conduct of Profeta and others underlying those charges included Profeta and others threatening the principals of a fuel transportation company and a restaurant with physical harm if they failed to pay protection money to the Luchese family.  In addition, they used violent threats to force a different restaurant owner to pay a particular meat distributor.  Profeta was sentenced to 41 months' imprisonment and three years of supervised release.  While on supervised release, Profeta committed the offenses charged in the current indictment, showing

---

[4]    Profeta was indicted for different crimes in both the Southern and Eastern Districts of New York.  The indictment in the Eastern District of New York was transferred to the Southern District of New York pursuant to Federal Rule of Criminal Procedure 20.

26

that he cannot be trusted to refrain from engaging in criminal activities on pretrial supervision.

**IV.**  **Conclusion**

    For the reasons cited above, the government respectfully request a permanent order of detention with respect to defendants Anthony Mannone, Carlo Profeta and Jerome Caramelli.

Dated:  Brooklyn, New York
     February 24, 2010

         Respectfully submitted,

         BENTON J. CAMPBELL
         United States Attorney
         Eastern District of New York
         271 Cadman Plaza East
         Brooklyn, New York 11201

Rachel J. Nash
Assistant United States Attorney